UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
MAUREEN MAHONEY,                                    Index No.   2:19-CV-3356

                  Plaintiff,

          - against -
                                                            **COMPLAINT**

UNITED CEREBRAL PALSY ASSOCIATION
OF LONG ISLAND, JANINE KLEIN, and                   **JURY TRIAL**
MARK CREAN,                                         **DEMANDED**

                  Defendants.
------------------------------------------------------------------------X

Plaintiff Maureen Mahoney (hereinafter "Plaintiff" or "Mahoney"), by her attorneys, Beranbaum Menken LLP, complains of Defendant United Cerebral Palsy Association of Long Island (hereinafter "UCP-LI") and Defendants Janine Klein (hereinafter "Klein") and Mark Crean (hereinafter "Crean") (collectively "Defendants") as follows:

**PRELIMINARY STATEMENT**

1.      UCP-LI is "one of the most far-reaching and successful providers of services to people with a wide range of disabilities on Long Island," according to its website.

2.      UCP-LI provides individualized adult services, including employment and residential services, to improve the skills and increase the independence of disabled individuals.

3.      Plaintiff was UCP-LI's Vocational Rehabilitation Administrative Coordinator for more than thirty (30) years.

4.      Unfortunately for Plaintiff, UCP-LI was more concerned with making money than with recognizing loyal service and dedication to the organization and its disabled clients.

5.      In 2018, Plaintiff discovered that Certified Rehabilitation Counselor/Job Coach Deb Verso ("Verso") was exaggerating the amount of time she was spending with clients and

1

that UCP-LI was thus over-reporting Verso's hours to the New York State Office for People with Developmental Disabilities ("OPWDD").

6. When Plaintiff complained about Verso's fraudulent hours, UCP-LI retaliated against Plaintiff by terminating her employment without notice after more than thirty years.

7. Plaintiff now brings this action, pursuant to the False Claims Act, 31 U.S.C. § 3730 ("FCA") and the New York False Claims Act, N.Y. State Fin. Law § 191 ("NYFCA"), to remedy Defendants' retaliation against her after she repeatedly raised concerns about Medicaid fraud.

8. Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages, costs and reasonable attorneys' fees, and all other appropriate relief.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331.

10. In addition, this Court has jurisdiction over Plaintiff's federal claims under the FCA pursuant to 31 U.S.C. § 3730(h)(2).

11. This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

12. As Defendant has its office in and regularly does business within Suffolk County, and because the circumstances giving rise to this action occurred within the Eastern District of New York, venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c).

## PARTIES

13. Mahoney is an eighty (80) year-old woman who resides in Bay Shore, New York and, at all relevant times, was an employee of UCP-LI within the meaning of the FCA and the NYFCA.

14. Defendant UCP-LI is a not-for-profit organization headquartered in Hauppauge, New York.

15. At all relevant times, UCP-LI was Mahoney's employer within the meaning of the FCA and the NYFCA.

16. Defendant Klein is and has been the Chief Financial Officer ("CFO") of UCP-LI at all relevant times.

17. As CFO, Defendant Klein has power over personnel decisions for UCP-LI's employees and exerted extensive control over their day-to-day work.

18. In that capacity, Klein was Mahoney's employer within the meaning of the FCA and the NYFCA.

19. Defendant Crean is and has been the Director of UCP-LI's Adult Program and Services at all relevant times.

20. Crean was Mahoney's direct supervisor, had power over personnel decisions regarding Mahoney, including whether and when to terminate her employment, and had extensive control of Mahoney's day-to-day work.

21. In that capacity, Crean was Mahoney's employer within the meaning of the FCA and the NYFCA.

## FACTUAL ALLEGATIONS

### Ms. Mahoney's Successful Career at UCP-LI

22. Mahoney began working for UCP-LI more than thirty (30) years ago as the Vocational Rehabilitation Administrative Assistant.

23. She was promoted within one year to Vocational Rehabilitation Administrative Coordinator.

24. In that capacity, Mahoney kept and reported statistics to the Director of Adult Program and Services and the accounting department. UCP-LI reported these statistics to the State of New York for funding and other purposes.

25. Mahoney reported to the Director of Adult Program and Services, who, beginning in May 2018, was Crean.

26. Mahoney took pride in working to enhance the lives of adults with disabilities, and she excelled at her job.

27. Mahoney enjoyed a very positive working relationship with Kim Anstey, former Director of Adult Program and Services, and neither Anstey nor Crean had any complaints about Mahoney's performance.

### Verso's and UCP-LI's False and Fraudulent Claims

28. UCP-LI employs seven or eight job coaches at a time. These job coaches work fixed shifts that begin at 8:00 a.m. and end at 4:30 p.m. They see four to five clients per day, and sometimes they report directly to their clients' job sites before coming in to UCP-LI's offices in Hauppauge, New York.

29. When job coaches came in to the office after meeting with a client or left the office before 4:30 p.m. to visit a client on their way home, Mahoney was responsible for adjusting their start and end times in the time-keeping system.

30. Job coaches also keep track of their mileage on a Car Allowance Certificate form each month.

31. They complete OPWDD Supported Employment Services Monthly Summary Notes as well. Supervisors use these Summary Notes to enter each job coaches' billable hours into a spreadsheet for OPWDD.

32. Mahoney began to find evidence that Verso was reporting more time in her Car Allowance and Summary Note logs than she was actually spending with or driving to see clients.

33. For example, on one particular day in July 2018, Ms. Verso told Ms. Mahoney that she began her work day at a client's job site at 6:30 a.m. in Stony Brook. That day, Verso got to UCP-LI's offices at 7:45 a.m. She reported in her paperwork that she spent two hours with a client that morning, but the most she could possibly have spent with that client given her start time and the time she arrived at the office was one hour.

34. Other times, Verso reported spending more time with clients than was possible in one day, given the number of clients and the amount of driving time she was also reporting for those days.

35. Because OPWDD funding for UCP-LI is based on the number of hours job coaches spend visiting with and traveling to visit with clients, these misrepresentations in the Summary Notes and Car Allowance sheets are material to a false or fraudulent claim for payment or approval under both the FCA and the NYFCA.

**Mahoney's Protected Whistleblower Activity**

36. In April 2018, Mahoney complained to then-Director Anstey that Verso was incorrectly reporting her mileage and other time.

37. Anstey attempted to address Mahoney's concerns by formalizing the system by which job coaches reported their hours and mileage, but Verso's false reporting continued into May 2018, when Crean replaced Anstey.

38. Verso bragged about getting home by 11:00 a.m. most days and about how quickly her appointments were over—"I get in, I do my thing, I check in, and out the door I go." Yet, she continued to report spending multiple hours with clients and driving around throughout the day to meet them.

39. Mahoney first brought Verso's fraudulent practices to Crean's attention in August 2018.

40. About a month later, in approximately the second week of September 2018, Mahoney approached Crean in his office and told him that she suspected "Medicaid fraud," specifically that Verso was stealing time and that UCP-LI was overbilling OPWDD as a result of Verso's inflated reports.

41. Crean told Mahoney to bring him proof, which she later did, as explained in more detail below.

42. The following week, Mahoney also told CFO Janine Klein that she suspected Verso of Medicaid fraud.

43. Klein asked if Mahoney had spoken to Crean about it and assured Mahoney, "I will not tolerate Medicaid fraud."

44. On Friday, October 5, 2018, Mahoney left a file on Crean's desk containing the evidence of fraud he requested in the form of falsified Car Allowance Certificates and OPWDD Monthly Summary Notes, plus some of her own handwritten notes explaining the discrepancies.

### UCP-LI's Retaliatory Termination of Mahoney's Employment

45. Mahoney asked Crean the following Monday if he had had a chance to look at the file, and he said he had not.

46. A mere two days later, on Wednesday, October 10, 2018, Mahoney met with Crean and Director of Human Resources Jayne Mancusi. In that meeting, Crean and Mancusi informed Mahoney that UCP-LI was terminating her employment due to "restructuring."

47. Despite claims of restructuring, upon information and belief, the only other Vocational Rehabilitation staff UCP-LI fired was Mahoney's close friend and confidant, Clara Tringali.

48. As a part-time administrative professional, Tringali was responsible for all of UCP-LI's State agency filings, including those for OPWDD.

49. Upon information and belief, Crean assumed Tringali was feeding Mahoney information about Verso's falsified hours and, for that reason, terminated her employment as well.

50. In August or September 2018, Crean asked Tringali if she could come in to the office three days per week instead of two. The fact that he increased her hours a few weeks before terminating her employment undermines UCP-LI's claim that both she and Plaintiff were fired due to budgetary constraints.

51. Thus, after more than thirty years of loyal service to UCP-LI and the developmentally disabled, the organization let Mahoney go completely without warning and in obvious retaliation for her complaints.

52. As a result of Defendants' unlawful conduct, Plaintiff has sustained damages, including, but not limited to lost wages and other benefits.

53. At eighty years old, Mahoney is unlikely to find meaningful employment, compounding her economic damages.

## FIRST CAUSE OF ACTION
## VIOLATION OF THE FALSE CLAIMS ACT
## RETALIATION

54. Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth therein.

55. Plaintiff engaged in conduct protected under the FCA when she complained to Crean and Klein that Verso was engaged in Medicaid fraud and provided them with evidence to support her complaint.

56. Plaintiff had a good faith and objectively reasonable belief that Defendants were committing fraud against the government by relying on Verso's falsified Summary Notes and Car Allowance sheets in its financial reporting to OPWDD.

57. Plaintiff's conduct was in furtherance of an action under the FCA.

58. Defendants terminated Plaintiff in retaliation for her statutorily protected conduct.

## SECOND CAUSE OF ACTION
## VIOLATION OF NEW YORK FALSE CLAIMS ACT
## RETALIATION

59. Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth therein.

60. Plaintiff engaged in conduct protected under the FCA when she complained to Crean and Klein that Verso was engaged in Medicaid fraud and provided them with evidence to support her complaint.

61. Plaintiff had a good faith and objectively reasonable belief that Defendants were committing fraud against the government by relying on Verso's falsified Summary Notes and Car Allowance sheets in its financial reporting to OPWDD.

62. Plaintiff's conduct was in furtherance of an action under the NYFCA.

63. Defendants terminated Plaintiff in retaliation for her statutorily protected conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter a judgment:

a. Declaring the acts and practices complained of herein to be violations of the FCA and the NYFCA;

b. Enjoining and permanently restraining these violations of law;

c. Directing UCP-LI to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

d. Directing Defendants to place Plaintiff in the position that she would have occupied but for the Defendants' unlawful conduct, and making her whole for all earnings and other benefits she would have received but for the Defendants' unlawful conduct, including, but not limited to, two times the amount of lost wages, commissions, other lost benefits, loss of good will, and interest thereon;

e. Compensating Plaintiff for any special damages sustained as a result of the discrimination;

    f.   Awarding Plaintiff the costs of this action along with reasonable attorneys' fees and liquidated damages; and

    g.   Granting such other relief as this Court deems necessary and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.

Dated: New York, New York
        June 5, 2019

By:   */s/ Bruce E. Menken*
       Bruce E. Menken
       Marielle A. Moore
       BERANBAUM MENKEN LLP
       80 Pine Street, 33rd Floor
       New York, New York 10005
       Ph: (212) 509-1616
       Fax: (212) 509-8088